## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JERRY RODRIGUEZ and**
**ELAINE ROMERO**
Plaintiffs,

vs.                                                            No. 1:13-cv-00169-JAP/KBM

**THE CITY OF ALBUQUERQUE,**
**RAY SCHULTZ, in this Official Capacity,**
**DOUG WALTON, JOHN WHISONANT,**
**SCOTT MILLS, RUSSELL PEREA,**
**CARL CLELAND, and JOHN DOES**
**1-4, in their individual capacities,**
Defendants.

## MEMORANDUM OPINION AND ORDER

On July 26, 2013, Defendants Scott Mills and Russell Perea filed a motion for summary

judgment based on qualified immunity. *See* DEFENDANT RUSSELL PEREA AND

DEFENDANT SCOTT MILLS' MOTION FOR SUMMARY JUDGMENT BASED ON

QUALIFIED IMMUNITY AND ON PLAINTIFFS' INABILITY TO SUPPORT CLAIMS

(Doc. No. 22). On August 15, 2013, the remainder of the Defendants – the City of Albuquerque,

Carl Cleland, Ray Schultz, Doug Walton, and John Whisonant (the City Defendants) – filed a

second motion for summary judgment based in part on qualified immunity. *See* DEFENDANTS

CITY OF ALBUQUERQUE, RAY SCHULTZ, DOUG WALTON, JOHN WHISONANT AND

CARL CLELAND'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN

SUPPORT, REQUESTING DISMISSAL OF PLAINTIFFS' COMPLAINT ON QUALIFIED

IMMUNITY GROUNDS (Doc. No. 28) (collectively, Motions for Summary Judgment).

Defendants then asked the Court to stay discovery pending disposition of the qualified immunity

issues. *See* DEFENDANTS RUSSELL PEREA AND SCOTT MILLS' MOTION FOR STAY

OF DISCOVERY PENDING DISPOSITION OF MOTION FOR QUALIFIED IMMUNITY
(Doc. No. 24) (Motion to Stay); DEFENDANTS' CITY OF ALBUQUERQUE, SCHULTZ,
WALTON, WHISONANT AND CLELAND'S NOTICE OF JOINDER IN DEFENDANTS'
MILLS AND PEREA'S MOTION FOR SUMMARY JUDGMENT [DOC. 23] AND MOTION
TO STAY DISCOVERY [DOC. 24] (Doc. No. 27). In response, Plaintiffs requested additional
discovery to develop an adequate factual record on which to resolve Defendants' Motions for
Summary Judgment. *See* PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR STAY OF
DISCOVERY AND PLAINTIFFS' AND [sic] REQUEST FOR LIMITED DISCOVERY (Doc.
No. 32) (Response).

On October 3, 2013, the Court conducted a hearing on Defendants' Motion to Stay and
on Plaintiffs' request for limited discovery. The Court granted in part Defendants' Motion to
Stay, but permitted limited discovery concerning qualified immunity. *See* ORDER DENYING
IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO STAY (Doc. No. 41). In
addition, the Court concluded that there was a genuine issue of material fact about the amount of
force Detectives Perea and Cleland used against Plaintiff Jerry Rodriguez. As a result, the Court
denied Detectives Perea and Cleland's request for summary judgment on Mr. Rodriguez's
excessive force claim. *See* ORDER (Doc. No. 40). The Court reserved ruling on the remaining
issues raised by the Motions for Summary Judgment. *Id.*

After limited discovery was complete, Plaintiffs voluntarily dismissed all claims against
Defendant John Whisonant. *See* STIPULATED NOTICE OF DISMISSAL WITH PREJUDICE
(Doc. No. 44). On November 12 and November 27, the parties filed supplemental briefing on
whether the remaining individual Defendants – Sergeant Walton, Officer Mills, Detective Perea,

and Detective Cleland  – are entitled to qualified immunity on Plaintiffs' §1983 claims.[1] *See* DEFENDANT RUSSELL PEREA AND DEFENDANT SCOTT MILLS' SUPPLEMENTAL BRIEFING IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY AND ON PLAINTIFFS' INABILITY TO SUPPORT CLAIMS (Doc. No. 45); DEFENDANTS CITY OF ALBUQUERQUE, RAY SCHULTZ, DOUG WALTON AND CARL CLELAND'S SUPPLEMENTAL BRIEFING IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT (Doc. No. 46); PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFING (DOCS. 45 & 46) (Doc. No. 48). Having reviewed the supplemental briefing, the Court finds that the individual Defendants are entitled to qualified immunity on Plaintiffs' unlawful seizure claims and on Plaintiff Elaine Romero's excessive force claim. However, there are genuine issues of material fact concerning whether Sergeant Walton and Officer Mills are entitled to qualified immunity on Plaintiff Jerry Rodriguez's excessive force claim. The Court will deny in part and grant in part the Motions for Summary Judgment.[2]

---

[1] In his supplemental brief, Detective Perea asks the Court to enter summary judgment in his favor on Mr. Rodriguez's excessive force claim. Because the Court already denied summary judgment as to this claim, it will not revisit the issue in this Memorandum Opinion and Order.

[2] In this Memorandum Opinion and Order, the Court limits its attention to the issue of qualified immunity. Defendants initially asked for summary judgment on several claims to which qualified immunity is not a defense. The City of Albuquerque and Ray Schultz, who is sued in his official capacity, asked the Court for summary judgment on the claims against them. In addition, Defendants moved for summary judgment on Plaintiffs' New Mexico tort claims. However, Defendants' briefing focused on qualified immunity. Furthermore, at the Defendants' request, the Court stayed full discovery pending disposition of the qualified immunity issues. For these reasons, the non-qualified immunity issues that were raised by Defendants' Motions for Summary Judgment were never fully developed. The Court will deny, as premature, Defendants' request for summary judgment on these claims and will permit Defendants to present the non-qualified immunity issues in a separate summary judgment motion after the facts are more fully developed.

## BACKGROUND

### A.  THE NOVEMBER 4, 2010 STOP

On November 4, 2010, a civilian called 911 in Rio Rancho after spotting a black Hummer with flame accents in a Home Depot parking lot. Transcript of November 4, 2010 911 Call (Doc. No. 32-5) 2:1-3:15. The caller recalled seeing something on the news about a black Hummer with flames being connected to a shooting. *Id.* In response to the call, Rio Rancho police detained Mr. Rodriguez, the driver of the Hummer, while Sandoval County Dispatch made contact with the Albuquerque Police Department (APD). Transcript of November 4, 2010 Inter-Office Phone Calls (Doc. No. 32-9) 10:10-10:12. APD explained that Mr. Rodriguez's Hummer did not match the description of the Hummer involved in the homicide, which had Mexican plates, a chrome diamond-plated rocker panel, and maroon flame decals. *Id.* at 2:2-8, 3:18-21. An APD homicide detective confirmed that Mr. Rodriguez was not the suspect "for sure." *Id.* at 13:3.

### B.  THE DECEMBER 7, 2010 STOP

On December 7, 2010, around 11:30 a.m., APD received another tip from a citizen who spotted a black Hummer with flame accents near the Cottonwood Mall in Albuquerque, New Mexico. CAD Report for Police Call #103410456 (Doc. No. 28-1); Police Call #103410468 (Doc. No. 32-12). APD Dispatch advised APD officers of the tip by issuing a BOLO/ATL (Be on the Lookout for/Attempt to Locate) for a black, lifted Hummer with flame accents, which was wanted in connection with a November 2010 homicide. Police Call #103410468 (Doc. No. 32-12). After the BOLO/ATL was issued, an unidentified officer responded to Dispatch and stated that, to the best of his recollection, the Hummer involved in the November homicide was a black, lifted Hummer with a chrome rocker panel, red flames, and Chihuahua plates. *Id.* Track 2, 1:14.

4

Around 11:45 a.m., Officer Mills located an unoccupied black, lifted Hummer with flame accents in the parking lot of a Sweet Tomatoes restaurant on Coors Boulevard in Albuquerque. Mills Police Report (Doc. No. 28-3). Officer Mills radioed Dispatch with the location, the description of the Hummer, and the license plate number. *Id.* He stated that he was "not sure if it is the vehicle we are looking for." Real Time Police Call #103410468 (Doc. No. 48-2) (Real Time Call) 1:02.

Sergeant Walton responded to the dispatch by going to the scene. He parked his unmarked vehicle across the parking lot so that he could see the driver's side of the Hummer and ordered two plain clothes detectives, Detective Perea and Detective Cleland, to come assist with the investigation. Deposition of Doug Walton (Doc. No. 48-3) (Walton Deposition) 7:16-8:4, 10:8-12. Sergeant Walton directed Detectives Perea and Cleland to enter Sweet Tomatoes and attempt to locate and identify the Hummer's driver. *Id.* at 8:13-19, 9:13-16. Finally, Sergeant Walton issued a general order to Detectives Perea and Cleland, as well as to the other marked police units who came to the scene, to prevent any suspects from entering the Hummer and "going mobile." *Id.* at 9:2-8.

Around this time, an officer provided a more elaborate description of the Hummer over the radio; according to the description, the Hummer located in the Sweet Tomatoes parking lot was a black, lifted Hummer with orange flames and chrome testicles hanging from the rear bumper. Real Time Call at 7:43-50. Immediately thereafter, Dispatch stated that the Hummer was registered to a Mr. Jerry Rodriguez. *Id.* at 7:59-8:12. This exchange occurred within eight minutes of the initial radio call from Officer Mills locating the vehicle and relaying the license plate number.

Dispatch explained that Mr. Rodriguez's Hummer had been "involved in several 31s of the same situation, they saw on the news in reference to this black Hummer with flames and this has been going on all of November." *Id.* at 8:30-43. After being asked about the previous calls, Dispatch stated: "negative 25 with any 34s so far," which appears to mean that there was no police contact.[3] *Id.* at 8:49-9:00. Roughly 12 minutes later, Dispatch radioed with additional information about the alleged murder; according to Dispatch, the murder suspects were two "SMAs," who police believed to be Mexican nationals. *Id.* at 21-:40-50. In addition, Dispatch informed the officers that the Hummer involved in the murder was a black, lifted Hummer with red flames. *Id.* at 21:50-56.

While the Hummer remained unoccupied, Sergeant Walton, Sergeant Whisonant, and Dispatch made efforts to contact the investigator in charge of the homicide and confirm or deny whether the Hummer parked in the Sweet Tomatoes lot was the Hummer involved in the homicide. Deposition of John Whisonant (Doc. No. 46-2) 20:1-21:8. Sergeant Whisonant testified that he "started digging" for information as soon as the BOLO was issued. *Id.* at 20:1-13. However, there was some confusion about which department was handling the homicide investigation. *Id.* at 17:18-25.

At 12:07 p.m., before police made contact with the investigator in charge of the homicide, Sergeant Walton observed a man, who was later identified as Plaintiff Jerry Rodriguez, walking towards the driver's side of the Hummer. *Id.* at 23:40. Sergeant Walton radioed the surrounding police units and told them a suspect was entering the Hummer.

Before Mr. Rodriguez could open the driver's side door, Detectives Perea and Cleland stopped him. Plaintiffs and Defendants dispute the nature of the encounter. Detectives Perea and

---

[3]According to the brevity code table, 10-25 means "contact" and 10-34 means "officer or meet officer." All of the codes start with 10. *See* Albuquerque Police Department – Brevity Codes, Exhibit 14 to Response (Doc. No. 32-14).

Cleland claim that they approached Mr. Rodriguez and identified themselves as Albuquerque Police. *See* Cleland and Perea Police Reports (Doc. No. 28-3). According to Defendants, Mr. Rodriguez began to reach into his vehicle, at which point Detectives Perea and Cleland grabbed his arms and ordered him to the ground. *See id.*

Mr. Rodriguez provided an affidavit stating that Detectives Cleland and Perea "forcefully grabbed" him from behind without any warning and without identifying themselves as police. Affidavit of Jerry Rodriguez (Doc. No. 32-2) ¶ 6. According to Mr. Rodriguez, he did not resist, but was taken to the ground. His "arms were jerked behind [his] back and lifted upward." He was "pressed into the ground by several men who were holding [him] down by [his] waist, sitting on [his] back, and leaning forward and pressing their knees into [his] neck." *Id.* ¶¶ 8-11.

Officer Mills observed part of the encounter between Mr. Rodriguez and Detectives Perea and Cleland when he approached the Hummer on foot as a "cover officer" with his sidearm drawn and held low pointed toward the ground. Deposition of Neil Scott Mills (Doc. No. 48-1) 26:24-27:5, 30:17-31:4. When Officer Mills first observed Detectives Perea and Cleland, "they had an adult male subject restrained, one detective on each arm." *Id.* at 17:14-17. At that time, Mr. Rodriguez was standing. *Id.* at 21:3-19. After hearing Detectives Perea and Cleland tell Mr. Rodriguez to get on the ground, Officer Mills also told Mr. Rodriguez to get on the ground. *Id.* at 32:21-24.

According to Officer Mills, Mr. Rodriguez eventually stopped struggling and got down on his stomach. *Id.* at 33:2-9. Officer Mills then watched Detectives Perea and Cleland pat down Mr. Rodriguez. *Id.* at 36:13-14. When asked about the pressure applied to Mr. Rodriguez's back, Officer Mills explained that the encounter occurred three years ago, so he could not "specifically answer that. They were holding him on the ground as they were patting him down. I don't know

7

what amount of pressure they exerted as they were holding him in place." *Id.* at 37:3-13. In addition, Officer Mills testified that he did not recall seeing either Detective Perea or Detective Cleland touch Mr. Rodriguez with their knees. *Id.* at 36:24-37:2. Officer Mills never touched Mr. Rodriguez. *Id.* at 38:3-5.

Sergeant Walton also observed portions of the encounter between Mr. Rodriguez and Detectives Perea and Cleland. However, like Officer Mills, Sergeant Walton did not see what happened when Detectives Perea and Cleland initially stopped Mr. Rodriguez.  When Sergeant Walton first witnessed Detectives Perea and Cleland with Mr. Rodriguez "[o]ne of them had him by one arm; the other had him by the other arm." *Id.* at 17:5-8. Although Sergeant Walton was close enough to communicate with Detectives Perea and Cleland by voice, he did not say anything to them. *Id.* at 17:9-13, 18:15-20.  Instead, he positioned himself behind the Hummer in order to "control whatever was going on on either side." *Id.* at 19:9-16.

It is not clear exactly how much Sergeant Walton witnessed from this vantage point. In his deposition, Sergeant Walton testified that he observed Detectives Perea and Cleland "escort" Mr. Rodriguez to the sidewalk. *Id.* at 26:15-21.  According to Sergeant Walton, Mr. Rodriguez was "walking under his own power and walking back to the sidewalk" without "any extensive struggle." *Id.* Sergeant Walton flatly denied seeing Mr. Rodriguez lying on his stomach, but equivocated about whether he ever saw Mr. Rodriguez off his feet. *Id.* at 27:18-22, 28:2-6. According to Sergeant Walton's testimony, "there was a point, basically where [Mr. Rodriguez] was – well, I didn't see them actually with him, you know, put him on the ground, but there was a point, basically, where – I can't remember if he was on his – if he was on his knees or if there was a point, there, but that's the point basically – only time I saw him off of his feet." *Id.* at 27:10-17. When directly asked if he saw Mr. Rodriguez on his knees, Sergeant Walton

answered: "I can't remember if he was on his knees or if he was right in that area, but, yeah, he was – he was kind of down, I guess." *Id.* at 27:18-22.

While Detectives Perea and Cleland detained Mr. Rodriguez, other unnamed police officers forced Plaintiff Elaine Romero out of the passenger side of the Hummer, where she was sitting. These officers handcuffed Ms. Romero, searched her person and her purse, and placed her inside of a patrol vehicle. Affidavit of Elaine Romero (Doc. No. 32-3) ¶ 8-10.

As Mr. Rodriguez and Ms. Romero were being detained, Sergeant Barboa, a detective involved with the homicide investigation, made contact with Dispatch. Sergeant Barboa informed the on-scene officers that Mr. Rodriguez was not the murder suspect. Mr. Rodriguez and Ms. Romero were then released. Affidavit of John Whisonant (Doc. No. 28-2) ¶ 14-16. A review of the Real Time Police Call indicates that the detention of Mr. Rodriguez and Ms. Romero lasted less than five minutes; the whole course of events between Officer Mills finding the Hummer and the release of Mr. Rodriguez and Ms. Romero occurred within 30 minutes.

## DISCUSSION

Qualified immunity shields law enforcement officials from liability for harm caused by reasonable mistakes, "protecting all but the plainly incompetent or those who knowingly violate the law." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established at the time of defendant's conduct. *Courtney v. Okla. ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

In cases where there are factual disputes, the Court should generally resolve the qualified immunity issue by "adopting the plaintiff's version of the facts." *Rojas v. Anderson*, 2013 WL 3389450, at *2 n. 5 (10th Cir. July 9, 2013) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)); *see also Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (evaluating a qualified immunity summary judgment motion by drawing factual inferences in the light most favorable to the plaintiff, the nonmoving party).

### 1.  UNLAWFUL SEIZURE

#### A.  The Court Construes Plaintiffs' Unlawful Seizure Claim as a Claim that Defendants Lacked Reasonable Suspicion to Detain Plaintiffs.

Plaintiffs allege that the individual Defendants unlawfully seized them in violation of the Fourth Amendment. Ordinarily, the Fourth Amendment prohibits police officers from conducting searches or seizures without probable cause.[4] *United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012). However, the Supreme Court has created an exception for investigative detentions, which are brief detentions conducted for investigative purposes. *Id.* A law enforcement officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion" that the person committed a crime. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007). Reasonable suspicion is a lesser standard than probable cause. *Whitley*, 680 F.3d at 1233-34.

While the facts clearly indicate that the individual Defendants initiated the five-minute December 7, 2010 stop for investigative purposes, Plaintiffs occasionally suggest that the stop constituted an arrest, which must be supported by probable cause. For example, Plaintiffs allege

---

[4] Probable cause exists if "acts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008) (citing *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).

that none of the individual Defendants had "probable cause to believe that either Mr. Rodriguez or Ms. Romero had committed any crime whatsoever." Complaint for Damages for Injuries, Civil Rights Violations, and New Mexico Tort Claims Act Violations, Exhibit A to NOTICE OF REMOVAL (Doc. No. 1-1) (Complaint) ¶ 68. Because Plaintiffs reference probable cause rather than reasonable suspicion, the City Defendants argue that Plaintiffs did not allege Defendants lacked reasonable suspicion to detain them.

Plaintiffs' Response specifically states that the individual Defendants lacked reasonable suspicion, but it does not completely clarify Plaintiffs' position concerning the nature of the stop. At one point, Plaintiffs intimate that the Court should analyze the stop as an arrest requiring probable cause: "The Tenth Circuit, however, has dispelled of any notions that lend credence to Defendants' characterization of their unnecessarily intense and violent encounter with Plaintiffs as an 'investigative detention. . . '" Response at 27. However, aside from this isolated comment, Plaintiffs do not discuss the nature of the stop.

To the contrary, Plaintiffs concentrate on the reasonable suspicion standard. *See* Complaint ¶ 65 (Officer Mills "had good reason to believe [Mr. Rodriguez's Hummer] was the wrong vehicle"); Response 30-31 ("With the information [Defendants] received, there was no reasonable suspicion to support subsequent action.") (Because APD had previously cleared Mr. Rodriguez, a reasonable police officer "would not have proceeded to ambush and take down an individual law enforcement no longer had reason to believe was involved in any sort of criminal activity"); PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFING (DOCS. 45 & 46) (Doc. No. 48) (Defendants "knew, or reasonably should have known, that Mr. Rodriguez was not the suspect involved in the November 2010 homicide. Even, assuming arguendo, that there was cause to temporarily detain Mr. Rodriguez . . .). Accordingly, the Court

11

will treat the December 7, 2010 stop as an investigative detention and will construe Plaintiffs'

unlawful seizure claim as a claim that Defendants lacked reasonable suspicion to detain

Plaintiffs.[5]

### B.  The Individual Defendants had Reasonable Suspicion to Stop Plaintiffs

Plaintiffs contend that Officer Mills, Detective Perea, Detective Cleland, and Sergeant

Walton lacked reasonable suspicion to detain them at the time of the December 7, 2010 police

stop. To overcome the individual Defendants' assertion of qualified immunity, Plaintiffs must

show that (1) the individual Defendants detained Plaintiffs without reasonable suspicion, thereby

violating the Fourth Amendment, and (2) it would have been clear to a reasonable officer in each

Defendant's position that reasonable suspicion was lacking. According to clearly established

Tenth Circuit law, reasonable suspicion exists only if an officer has "a particularized and

objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 478

F.3d at 1115.

Plaintiffs present two basic arguments to show that the individual Defendants lacked

reasonable suspicion to stop them. First, Plaintiffs suggest that the individual Defendants knew

---

[5] Typically, a court assesses the legality of an investigative detention according to a two-step process: the court first considers whether the police had reasonable suspicion to effect the stop, then the court asks whether the stop was carried out in a manner "reasonably related in scope to the circumstances that first justified the interference." *Lundstrom*, 616 F.3d at 1120. Here, Plaintiffs contend that Defendants possessed no legal justification to detain them; however, as Defendants point out, Plaintiffs do not directly argue that the police conducted the stop in an unreasonable manner, for instance by continuing to detain Plaintiffs after Mr. Rodriguez was cleared. While Plaintiffs allude to the second half of the investigative detention analysis with their isolated references to probable cause, Plaintiffs do not fully develop the argument that Defendants' unreasonably violent conduct transformed the detention into an arrest requiring probable cause. As a result, the Court will not address the second half of the investigative detention analysis. Nonetheless, even if the Court were to do so, it would not affect the outcome of the case. A plaintiffs' claim that violent police conduct transformed an investigative detention into an illegal arrest requires the Court to evaluate the reasonableness of the force used by the police. *Id.* at 1122. When, as is the case here, there is no probable cause, such a claim is merely another way to state an excessive force claim, a claim which is already raised by the Plaintiffs and considered by the Court below. *See, e.g., United States v. Copening*, 506 F.3d 1241, 1248-49 (10th Cir. 2007) ("We, therefore, conclude the officers did not use excessive force in detaining Defendant and, thus, did not convert his detention into an unlawful arrest.").

Mr. Rodriguez "had already been questioned and released" prior to the December 7, 2010 stop. Response at 30. If true, this would certainly negate reasonable suspicion. However, Plaintiffs have produced no evidence showing that any of the individual Defendants knew about the November 4, 2010 stop or knew that APD had previously confirmed that Mr. Rodriguez was not a suspect in the homicide involving a black Hummer. The testimony of Sergeant Walton and Officer Mills, and the police reports of Officer Mills and Detectives Perea and Cleland, indicate that the individual Defendants honestly, if mistakenly, believed Mr. Rodriguez was a murder suspect at the time of the December 7, 2010 stop.

Second, Plaintiffs contend that the decision to stop Mr. Rodriguez and Ms. Romero was unreasonable because Defendants "closed [their] eyes to facts that would clarify the situation" and failed to "pursue reasonable avenues of investigation," which would have dispelled reasonable suspicion. Response at 29. As Plaintiffs correctly point out, the Fourth Amendment requires police officers to "investigate basic evidence, or otherwise inquire if a crime has been committed" before detaining a suspect. *Lundstrom*, 616 F.3d at 1125-26.

Plaintiffs identify several facts, available to the Defendants at the time of the stop, which indicated Mr. Rodriguez was not a murder suspect. First, before Officer Mills located Mr. Rodriguez's Hummer, an unnamed officer described the Hummer involved in the homicide as a black, lifted Hummer with a chrome rocker panel, red flames, and Mexico license plates. It is undisputed that Mr. Rodriguez's Hummer had orange flames and New Mexico plates. Second, Dispatch ran the license plate number on Mr. Rodriguez's Hummer and identified Mr. Rodriguez as the registered owner at least ten minutes before the police stop. Unlike the murder suspects, who were believed to be Mexican nationals, Mr. Rodriguez is a U.S. citizen.

Considered in hindsight, these facts certainly foreshadow the outcome of the stop: Mr. Rodriguez was not a suspect in the November 2010 homicide. Nonetheless, these facts are not enough to overcome Defendants' assertion of qualified immunity. Not only does qualified immunity protect "all but the plainly incompetent or those who knowingly violate the law," *Herrera*, 589 F.3d at 1070, factual mistakes never invalidate an investigative detention, if the mistakes are reasonable and the police are unaware of the mistake, *United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996). Here, it was reasonable for the police to overlook the factual discrepancies between Mr. Rodriguez and the murder suspects. Prior to the stop, Mr. Rodriguez's Hummer was empty; police could not be sure the registered owner was the current driver. In addition, the flame color was a minor detail, easily unnoticed in a "swiftly developing situation." *Id.* (The Tenth Circuit has reminded courts to "consider whether police are acting in a swiftly developing situation" and avoid "unrealistic second-guessing" of police decisions).

The police were told that APD was looking for a black, lifted Hummer with flame accents in connection with a homicide. The vehicle observed on December 7, 2010 was a black, lifted Hummer with flame accents. The similarity between Mr. Rodriguez's vehicle and the vehicle described by the BOLO/ATL provided Defendants with an objective basis to stop Mr. Rodriguez for investigative purposes. *See e.g. United States v. Lucky*, 569 F.3d 101, 106 (2d Cir. 2009) ("When police stopped Defendant's car, they certainly had reasonable suspicion in light of the fact that the automobile had the same license plate number and description as one used to flee from a shooting two days earlier."); *United States v. Gonzales*, 897 F.2d 504, 506 (10th Cir. 1990) (police may rely on a BOLO to briefly detain an individual and obtain information); *Lord v. Hall*, 520 Fed. App'x. 687, 691 (10th Cir. 2013) (unreported) (finding that police officers had reasonable suspicion to initiate a traffic stop where an individual's truck matched the description

of a truck that had just robbed a convenience store even though the driver, a 64-year-old man, did not match the description of the suspect, a 22-year-old man).

While Plaintiffs fault Defendants for failing to timely "cross reference the information APD had concerning Mr. Rodriguez," they provide no evidence that Sergeant Walton, Officer Mills, Detective Perea, or Detective Cleland unreasonably delayed the investigation. According to Sergeant Whisonant's undisputed testimony, he "started digging" the minute the BOLO was issued in an attempt to determine whether the Hummer in the Sweet Tomatoes parking lot was involved in the homicide. Despite Sergeant Whisonant's efforts, the police did not reach Sergeant Barboa, one of the detectives in charge of the homicide investigation, until after Mr. Rodriguez approached the Hummer and was detained.

Defendants were not constitutionally required to postpone the detention of Mr. Rodriguez until they had confirmed that he was a suspect. *See Armijo v. Peterson*, 601 F.3d 1065, 1072 (10th Cir. 2010) (As long as police officers act reasonably, they "need not exhaust every avenue of dispelling suspicion" prior to detaining a suspect.). Courts have routinely dismissed Fourth Amendment challenges to investigative detentions in which the police failed to confirm the physical description of the suspect or the vehicle prior to the stop and therefore mistakenly detained the wrong person. *See United States v. Webster*, 314 Fed. App'x. 226, 229 (11th Cir. 2008) ("Although it might have been better for Officer Manora to call in to confirm the BOLO before stopping Webster, we cannot say that it was unreasonable for him not to do so.); *Shareef*, 100 F.3d at 1505-1506 (finding that an officer did not behave "unreasonably in failing to confirm the physical description of the suspect" prior to the stop). Sergeant Walton, Officer Mills, Detective Perea, and Detective Cleland are entitled to qualified immunity on Plaintiffs' unlawful seizure claim.

15

**2.   EXCESSIVE FORCE**

Plaintiffs allege that Detectives Perea and Cleland and other unnamed APD police officers used excessive force against them during the December 7, 2010 investigative detention and that Officer Mills and Sergeant Walton were personally involved in this excessive force and should be held liable for injuries caused by the excessive force. To defeat Officer Mills and Sergeant Walton's assertion of qualified immunity, Plaintiffs must show that (1) Officer Mills and Sergeant Walton personally participated in the use of excessive force against Mr. Rodriguez and Ms. Romero, and (2) it would have been clear to a reasonable officer in Officer Mills' position and in Sergeant Walton's position that the force exercised against each Plaintiff was excessive and unconstitutional.

The force employed during a police detention is excessive if it is greater than reasonably necessary. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Three non-exclusive factors guide the reasonableness analysis: the severity of the crime, the level of threat posed by the suspect to the officer and to public safety, and the amount of resistance or compliance exhibited by the suspect. *Id.* at 396. However, when faced with an excessive force claim, a court should always consider the totality of the circumstances. *Id.*

Plaintiffs contend that it was unreasonable for the police to use any force against either Mr. Rodriguez or Ms. Romero, because the police "knew or should have known that Mr. Rodriguez and his Hummer had already been cleared of wrongdoing." Response at 33. This argument confuses Plaintiffs' unlawful seizure claim with Plaintiffs' excessive force claim, which is separate and distinct. *See Cortez*, 478 F.3d at 1115. The outcome of an excessive force claim hinges on the degree of force used during the stop, not the officer's justification for the stop. "[I]n a case where police effect . . .  a detention without reasonable suspicion, but use no

16

more force than would have been reasonably necessary if . . . the detention were warranted, the plaintiff has a claim for unlawful . . . detention but not an additional claim for excessive force." *Id.* at 1127.

The individual Defendants were entitled to stop Plaintiffs and had "the right to use some degree of physical coercion or threat" to effect the stop. *Graham*, 490 U.S. at 396. To withstand summary judgment, Plaintiffs must articulate how the force used against Mr. Rodriguez and Ms. Romero was greater than necessary. In addition, because"[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation," *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)), Plaintiffs must pinpoint how each named Defendant participated in the alleged excessive force.

### A. Ms. Romero

Plaintiffs provided an affidavit from Ms. Romero stating that three unnamed officers "forced [her] out of the vehicle, handcuffed [her], and put [her] inside of a patrol vehicle." These officers searched Ms. Romero and her purse. As an initial matter, it is not obvious that Officer Mills or Sergeant Walton[6] can be held liable for the conduct of the unnamed officers who detained Ms. Romero. However, the Court need not address the issue. Whether or not Officer Mills and Sergeant Walton were personally involved in Ms. Romero's detention, it is clear that the force used against Ms. Romero was objectively reasonable.

The law does not require police officers "to take unnecessary risks in performing their duties." *United States v. Albert*, 579 F.3d 1188, 1193 (10th Cir. 2009). To the contrary, it

---

[6] In the complaint, Plaintiff Ms. Romero asserts an excessive force claim against Sergeant Walton, Officer Mills, Detective Perea, and Detective Cleland. However, in the briefing, Plaintiffs do not argue that either Detective Perea or Detective Cleland was involved in the force used against Ms. Romero. The Court will grant Detective Perea's and Detective Cleland's Motions for Summary Judgment and will dismiss Ms. Romero's excessive force claims against them.

authorizes police officers to take measures reasonably necessary to protect their personal safety during an investigative detention. *Id.* The procedures used against Ms. Romero were justified because she was traveling with a murder suspect, someone the police reasonably believed was armed and dangerous, and she was sitting in a vehicle the police believed was involved in a homicide by shooting.

Plaintiffs' briefing, which focuses on Mr. Rodriguez, makes no effort to explain why the force used against Ms. Romero was unreasonable. Plaintiffs do not distinguish the facts of this case from cases like *United States v. Shareef*. In *Shareef*, the Tenth Circuit held that it was reasonable for police officers to "forcibly remove[]" the occupants of a vehicle at gun point, pat them down, handcuff them, and order to them kneel on the pavement, because the officers had received information, which later proved to be incorrect, that one of the occupants of the vehicle was wanted on a weapons violation. *Shareef*, 100 F.3d at 1502, 1506.

*Shareef* is one illustration of a general pattern: when there is evidence that a suspect is armed and dangerous, the Tenth Circuit has consistently allowed police officers who are attempting to detain the suspect to draw their weapons, conduct pat down searches of the suspect and his or her companions, and, when there is a vehicle stop, handcuff unidentified individuals travelling in the car with the suspect. *See United States v. Lang*, 81 F.3d 955, 966 (10th Cir. 1996) (holding that it was reasonable for police to pat down the defendant during an investigative detention because the person with whom he was traveling was a suspect in two armed robberies and a robbery/murder); *United States v. Merritt*, 695 F.2d 1263 (10th Cir. 1982) (knowledge that arms were found at suspect's residence justified the officer's suspicion that the suspect and his unidentified companion may be armed and warranted police in searching the suspect and his companion during the stop); *see also United States v. Perea*, 374 F. Supp. 2d

961, 975 (D.N.M. 2005) (finding that it was reasonable for the police to order an occupant of a vehicle out of the car at gun point because the officers had identified the vehicle as being used in an illegal narcotics transaction and "the officers believed, although incorrectly, that the driver of the [vehicle] was possibly wanted in reference to a murder investigation."). These cases indicate that the force the police officers used against Ms. Romero was objectively reasonable. Thus, the individual Defendants are entitled to qualified immunity on Ms. Romero's excessive force claim.

### B.  Mr. Rodriguez

Plaintiffs assert that Sergeant Walton and Officer Mills are personally responsible for the allegedly unconstitutional conduct of Detectives Perea and Cleland, the two police officers who physically restrained Mr. Rodriguez. At the time of the stop, well-settled Tenth Circuit precedent put Sergeant Walton and Officer Mills on notice of the duty to intervene if they observed a constitutional violation. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) ("An officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983.").

Here, Sergeant Walton and Officer Mills admit to observing the physical encounter that forms the basis of Mr. Rodriguez's excessive force claim. If the events unfolded as Mr. Rodriguez describes, with Detectives Perea and Cleland jerking his arms and sitting on his back and Sergeant Walton and Officer Mills witnessed these events, then Sergeant Walton and Officer Mills would have had a clear duty to intervene.[7] In other words, it would have been clear to a

---

[7] In the October 4, 2013 ORDER (Doc. No. 40), the Court explained that it is unreasonable to jerk the arms and sit on the back of a compliant suspect. The Court will not revisit the issue at length. It is sufficient to note that clearly established precedent prohibits an officer from using "force on a compliant suspect already under the officer's control and not resisting detention or trying to flee." *Chidester v. Utah County*, 268 Fed. App'x. 718, 729 (10th Cir. 2008). Additionally, the facts of Mr. Rodriguez's detention are similar to the facts of *Lundstrom*, 616 F.3d 1108, a case where the Tenth Circuit denied qualified immunity to police officers who placed their elbows and/or knees against the back a compliant suspect and twisted the suspect's arm upwards.

reasonable officer that it would be unconstitutional to observe the events Mr. Rodriguez describes, yet do nothing to prevent them.

While Sergeant Walton and Officer Mills deny having seen Detectives Perea and Cleland put their knees on Mr. Rodriguez, or otherwise use excessive force, Plaintiffs have put forth sufficient evidence, through the affidavit of Mr. Rodriguez and the depositions of Sergeant Walton and Officer Mills, to raise a genuine issue of material fact concerning whether Sergeant Walton and Officer Mills saw Detectives Perea and Cleland use excessive force against Mr. Rodriguez. Officer Mills admits to observing the entirety of the encounter as Detectives Perea and Cleland forced Mr. Rodriguez to the ground and patted him down, during which time Mr. Rodriguez alleges Detectives Perea and Cleland jerked his arms and put their knees on his neck and back. Although it is less clear how much Sergeant Walton observed, there is sufficient evidence for a jury to conclude that he observed Detectives Perea and Cleland use excessive force against Mr. Rodriguez. Sergeant Walton admits to seeing Mr. Rodriguez "kind of down" and states that he positioned himself at the back of the Hummer to "control whatever was going on on either side."

Moreover, because Sergeant Walton was the supervising officer on the scene, under clear Tenth Circuit precedent, he can be held liable for the actions of Detectives Perea and Cleland even if he did not observe all of their behavior. While there is no direct supervisory liability under § 1983, a supervisor may be liable when there is an "affirmative link" between the constitutional violation and the supervisor's exercise of control or failure to supervise. *Fogarty*, 523 F.3d at 1162. Sergeant Walton ordered Detectives Perea and Cleland to detain Mr. Rodriguez, thereby setting "the wheels of the alleged constitutional deprivation in motion." *Id.* at 1163. He repeatedly emphasized that Detectives Perea and Cleland should not let Mr. Rodriguez

drive away, and then he placed himself in a position to supervise their detention of Mr. Rodriguez. Given these facts, the Court cannot say, as a matter of law, that Sergeant Walton's supervision was not affirmatively linked with the alleged excessive force.

In the briefing, Officer Mills emphasizes that he was a subordinate cover officer and argues that summary judgment is proper because Plaintiffs have failed to show that he had a "realistic opportunity to intervene to prevent the harm from occurring" as required by *Hall v. Burke*, 12 Fed. App'x. 856, 861 (10th Cir. 2001). The Court is not persuaded. "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* Officer Mills' own testimony establishes that he stood by and observed most of the encounter between Detectives Perea and Cleland and Mr. Rodriguez; a jury could conclude that Officer Mills had a realistic opportunity to intervene.

Because there are highly disputed facts concerning the amount of force used against Mr. Rodriguez, there is a genuine issue of material facts about whether Sergeant Walton and Officer Mills, the officers who arguably observed the allegedly unconstitutional use of force, are entitled to qualified immunity. As a result, summary judgment is not appropriate.

## 3.  REMAINING CLAIMS

Based on the Court's rulings, at this point, the following claims will proceed: (1) Mr. Rodriguez's Fourth Amendment excessive force claim against all Defendants, (2) Ms. Romero's Fourth Amendment excessive force claim against Mr. Schultz and the City of Albuquerque,[8] (3)

---

[8] Because the Court limited its attention to qualified immunity, Ms. Romero's excessive force claim against Mr. Schultz and the City of Albuquerque remains outstanding. However, by determining that the unnamed police officers used an objectively reasonable amount of force against Ms. Romero, the Court seriously undermined Ms. Romero's municipal liability claim against the City of Albuquerque and Mr. Schultz in his official capacity. The Court encourages Ms. Romero to consider voluntarily dismissing her remaining excessive force claims so as to expedite the litigation and avoid further motions.

Plaintiffs' Fourth Amendment unlawful seizure claim against Mr. Schultz and the City of Albuquerque, and (4) Plaintiffs' New Mexico tort claims.

IT IS THEREFORE ORDERED THAT:

1. DEFENDANTS SCOTT MILLS AND RUSSELL PEREA'S MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY (Doc. No. 22) is (1) granted as to Plaintiffs' unlawful seizure claim, (2) granted as to Plaintiff Elaine Romero's excessive force claim, (3) denied as to Plaintiff Mr. Rodriguez's excessive force claim, (4) denied as premature as to Plaintiffs' New Mexico tort claims.

2. DEFENDANTS CITY OF ALBUQUERQUE, RAY SCHULTZ, DOUG WALTON, JOHN WHISONANT AND CARL CLELAND'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 28) is (1) granted as to Plaintiffs' unlawful seizure claim against Defendants Walton and Cleland, (2) granted as to Plaintiff Elaine Romero's excessive force claim against Defendants Walton and Cleland, (3) denied as to Plaintiff Mr. Rodriguez's excessive force claim, (4) denied as premature as to the claims against Defendants the City of Albuquerque and Ray Schultz, (5) denied as premature as to Plaintiffs' New Mexico tort claims.

James A. Parker
_____
SENIOR UNITED STATES DISTRICT JUDGE